1  Russell M. Selmont (SBN 252522)
       rselmont@ecjlaw.com
2  **ERVIN COHEN & JESSUP LLP**
   9401 Wilshire Boulevard, Twelfth Floor
3  Beverly Hills, California 90212-2974
   Telephone  (310) 273-6333
4  Facsimile  (310) 859-2325

5  Attorneys for Plaintiffs, JOSHUA PORTER and GULSEN KAMA

**REDACTED VERSION OF DOCUMENT PROPOSED FOR SEALING [DOC. 20]**

6

7

8              **UNITED STATES DISTRICT COURT**

9     **CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION**

10

11  JOSHUA PORTER, an individual, and
   GULSEN KAMA, an individual,
12
                 Plaintiffs,
13
          v.
14
   NORTHERN DATA US, INC., a
15  Delaware corporation; NORTHERN
   DATA US HOLDINGS, INC., a
16  Delaware corporation; and DOES 1
   through 10, inclusive,
17
                 Defendants.
18

Case No. 2:24-CV-03389-ODW (AGRx)

*Hon. Otis D. Wright II – Crtrm 5D*

**FIRST AMENDED COMPLAINT FOR:**
1. **WRONGFUL TERMINATION IN VIOLATION OF PUBLIC POLICY (PORTER);**
2. **VIOLATION OF LABOR CODE SECTION 1102.5**
3.  **WRONGFUL TERMINATION IN VIOLATION OF PUBLIC POLICY (KAMA))**
4. **VIOLATIONS OF NEW JERSEY CONSCIENTIOUS EMPLOYEE PROTECTION ACT, N.J.S.A. § 34:19-1, ET SEQ.)**
5. **MISAPPROPRIATION OF NAME AND LIKENESS**
6. **INVASION OF PRIVACY**

**DEMAND FOR JURY TRIAL**

19

20

21

22

23

24

25

26

27

28

*Left margin:* ERVIN COHEN & JESSUP LLP

ERVIN COHEN & JESSUP LLP

1    Plaintiff Joshua Porter ("Plaintiff Porter"), and Plaintiff Gulsen Kama
2  ("Plaintiff Kama"), allege as follows in their First Amended Complaint (hereinafter,
3  jointly "Plaintiffs") against Defendants Northern Data US, Inc. and Northern Data
4  US Holdings, Inc. ("Defendants").

5                    **SUMMARY OF ACTION**

6    1.    Defendants are the US subsidiaries of Northern Data AG (together,
7  "Northern Data"), a publicly traded German company in the cryptocurrency and
8  bitcoin mining industries.  Plaintiff Porter was originally hired as Defendants' Chief
9  Operating Officer but after his exemplary performance over the first 8 months on
10 the job, he was promoted to President and CEO of Defendants.  Shortly after his
11 promotion, Plaintiff Porter began raising concerns to his superiors at the Northern
12 Data AG parent company that Northern Data was falsely misrepresenting the
13 strength of its financial condition to investors, regulators and business partners (they
14 were borderline insolvent) and equally problematic, Northern Data was knowingly
15 committing tax evasion to the tune of potentially tens of millions of dollars.
16 Plaintiff Porter's concerns fell on deaf ears, so he stated his intention to go directly
17 to Northern Data's Board of Directors to alert them of the companies' unchecked
18 illegal activity.  Shortly after, in obvious retaliation for his whistleblowing activity,
19 Plaintiff Porter was illegally terminated.  Defendants claimed the termination was
20 the result of an internal decision to eliminate the position of Northern American
21 Chief Operating Officer.  At the time of this termination, however, Plaintiff Porter
22 was Defendants' President and CEO (and had been for almost two months) and no
23 longer the Chief Operating Officer, so it is manifestly clear that Defendants
24 fabricated this excuse in a failed and transparent attempt to cover their tracks.
25 Defendants' illegal activity violates California labor laws and subjects Defendants to
26 millions of dollars of liability.

27   2.    Plaintiff Kama was originally employed as the North America Chief
28 Financial Officer ("NACFO") for the Defendants with a start date of July 20, 2022.

ERVIN COHEN & JESSUP LLP

1   After her outstanding performance as NACFO, about two months later she was

2   promoted to Group Deputy Chief Financial Officer ("DCFO") at Northern Data, and

3   about three months after that, she was named Group Chief Financial Officer

4   ("CFO"). Following her promotion, Plaintiff Kama was actively exposing and then

5   attempting to keep Defendants from falsely misrepresenting their financial position

6   to potential auditors, tax advisors and investors. At various junctures, Plaintiff

7   Kama reported her concerns regarding the accounting and securities fraud that she

8   was finding to Northern Data's global CEO, COO, the Chair of the Supervisory

9   Board and the company's Chief Legal and Compliance Officer, to no avail, because

10  the CEO and COO were perpetuating the accounting and securities fraud. The CEO

11  and COO intended to deceive existing and potential investors at an upcoming

12  meeting scheduled for June 12, 2023. As a result of Plaintiff Kama repeatedly

13  informing and warning the officers that were responsible for the illegal acts that they

14  were committing fraud, on or about June 8, 2023, Plaintiff Kama was retaliated

15  against and illegally terminated for her whistleblowing activities. Specifically,

16  Kama was terminated for her admonitions that Northern Data was flagrantly

17  violating securities and tax laws and her attempts to ensure Northern Data did not

18  continue to make fraudulent representations in connection with the company's audit

19  process and to impose audit controls and governance procedures on Northern Data's

20  most senior management. Defendants' illegal activity violates California and New

21  Jersey labor laws and subjects Defendants to millions of dollars of liability.

22  Moreover, Defendants misled investors when they published an investor

23  presentation in April 2023 with financials with Plaintiff Kaman's name, title and

24  picture, but did not ask her to review the presentation, misappropriating her name

25  and image, invading her privacy and showing her image in a false light.

26  Defendants' illegal activity violates labor laws and common law and also subjects

27  Defendants to millions of dollars of liability.

28  / / /

**ERVIN COHEN & JESSUP LLP**

## PARTIES

3.      Plaintiff Porter is an individual who at all relevant times was a resident of the County of Los Angeles, California.

4.      Plaintiff Kama is an individual that currently resides in the County of San Diego, California and was a resident of the State of New Jersey for part of the relevant time giving rise to these claims and a resident of the State of California for the other part of the time giving rise to these claims.

5.      On information and belief, Defendant, Northern Data US, Inc., is a Delaware corporation with a principal place of business in Reston, Virginia.

6.      On information and belief, Defendant, Northern Data US Holdings, Inc., is a Delaware corporation with a principal place of business in Reston, Virginia.

7.      Plaintiffs are ignorant of the true names and capacities of defendants sued herein as Does 1 through 10 and thus sues said defendants by their fictitious names.

8.      Plaintiffs are informed and believe and thereon allege that one or more of the fictitiously-named defendants is liable in some manner for the claims alleged herein.  Plaintiffs will amend this complaint to allege the true names and capacities of the fictitiously-named defendants when the same become known to them.

## JURISDICTION AND VENUE

9.      Jurisdiction and venue are proper in this Court because at the time of the events  giving rise to the labor claims alleged herein, Plaintiff Porter was an employee of Defendants, performing the majority of his work in the County of Los Angeles, California.  Furthermore, on information and belief, Defendants have business operations in Los Angeles, California, and the majority of the events giving rise to the causes of action herein occurred in Los Angeles, California. Many of Plaintiff Kama's claims arose and/or persisted while she was a resident of California.  Furthermore, Plaintiff' Kama's wrongful termination and retaliation

claims arise from the same type of whistleblowing activity as those of Plaintiff Porter and are derived from a common nucleus of operative facts (i.e., Defendants' tax evasion and other material misrepresentations about their financial condition) and there is a near total overlap in witnesses and parties.  Accordingly, Kama's claims are properly jointed to Porter's, further ensuring jurisdiction and venue are proper for all causes of action alleged herein.

10.     Furthermore, Defendants have had continuous contacts with the State of California. Aside from employing Plaintiff Porter while he was residing in Los Angeles, California, Defendant attended and was a "Platinum Sponsor" of the 2024 GPU Technology Conference  ("GTC24") which occurred on March 18, 2024 through March 21, 2024 at the San Jose Convention Center. This event is advertised by NVIDIA as being "the #1 artificial intelligence conference for developers, business leaders and artificial intelligence researchers." This event had an estimated 300,000 attendees appearing both virtually and in person. Roseanne Kincaid-Smith, Northern Data AG's Chief Person Officer ("Kincaid-Smith"), was one of multiple representatives from Northern Data US Holdings, Inc., in attendance. Defendant published advertisements of the conference dating back to at least one month prior to the event and hosted a panel at GTC24. Additionally, employees of Defendants had a stand which Defendants advertised in an attempt to encourage convention attendees to visit and "explore revolutionary Generative AI innovations" with them and their cloud division. Finally, on information and belief, Defendants also have a branch of Norther Data US Holding, Inc., and/or Northern Data US Inc. located in California.

## FACTS COMMON TO ALL CLAIMS

### Plaintiff Joshua Porter

11.     Plaintiff Porter is a highly-credentialed and successful technology executive, investor and advisor.  After graduating from Columbia University Business School in 2011, Plaintiff Porter joined Goldman Sachs before serving as

ERVIN COHEN & JESSUP LLP

FIRST AMENDED COMPLAINT

1  Managing Director at Reimagined Ventures, an experienced family investment
2  office, and then as Chief Executive Officer at NoCap, a mobile platform that allows
3  music artists to reach digital live audiences worldwide.

4       12.    Defendants recruited Plaintiff Porter to become their Chief Operating
5  Officer in March 2022.  On March 31, 2022, Roseanne Kincaid-Smith, Northern
6  Data AG's Chief Person Officer ("Kincaid-Smith"), emailed Plaintiff Porter an offer
7  of employment.  Pursuant to that email, Plaintiff Porter was to receive yearly
8  compensation of between $630K and $810K depending on bonuses, as well as 5000
9  options.

10       13.    On or about April 11, 2022, Plaintiff Porter signed an Offer Letter with
11  Defendant Northern Data US Holdings, Inc.  That agreement called for Plaintiff
12  Porter to commence work on or around May 1, 2022, established that his title was
13  COO, and that his duties were "central operations for the Americas..."  It also set
14  forth that he was receiving 5000 options to purchase "shares of NDUS's ultimate
15  parent, Northern Data AG, which option grant will be subject to your remaining
16  employed by NDUS or one of its affiliates through the date this is six (6) months
17  from the date on which your employment with NDUS commences under this letter."

18       14.    ██████████████████████████████████
19  ████████████████████████████████████████████████
20  ████████████████████████████████████████████████
21  ██████████████████████████████████████████████████
22  ███████████████████████████████████████████████████
23  ███████████████████████████████████████████████████
24  ██████████████████.

25       15.    ██████████████████████████████████
26  ████████████████████████████████████████████████
27  ████████████████████████████████████████████████
28  ████████████████████████████████████████████████

ERVIN COHEN & JESSUP LLP

1 ██████████████████████████████████████████████

2 ████

3    16.   ███████████████████████████████████████

4 ████████████████████████████████████████████████

5 ████████████████████████████████████████████████

6 ████████████████████████████████████████████ .

7    17.   In Q3 2022, Plaintiff Porter began negotiating a deal with a Texas-

8 based company for hosting services.  In connection with this deal, Plaintiff Porter

9 told Yoshida that Northern Data should recognize its profits in the United States

10 (and thus pay taxes thereon).  Thillainathan, however, disagreed even though

11 Deloitte had recently refused to provide the requested opinion letter.  Ultimately,

12 Northern Data instructed the Texas counterpart to keep all the Bitcoin owed to

13 Northern Data generated in its own cryptowallet so that no revenue would be

14 generated at that time (and thus no need to make a firm decision on whether to

15 recognize it as US revenue and pay taxes).  Plaintiff Porter assumed Northern Data

16 was just kicking the can down the road a little further before it would implement the

17 proper corporate tax structure and reporting protocols ████████████████████

18 ████████████████████████████████████

19    18.   In November 2022, Northen Data had to do a round of layoffs.

20 However, not only was Plaintiff Porter not laid off, but he was one of a few key

21 executives the company actually paid a Retention Bonus to keep from leaving.  The

22 Retention Bonus, dated December 14, 2022, compensated Plaintiff Porter $150K

23 and made clear that this payment "does not impact [Plaintiff Porter's] ability to

24 participate in any other bonus or cash incentive plan for which [Plaintiff Porter is]

25 otherwise eligible."

26    19.   Lest there be any doubt that Defendants were happy with and

27 impressed by Plaintiff Porter's job performance during his first eight months of

28 employment, on January 17, 2023, Plaintiff Porter was promoted to Defendants'

ERVIN COHEN & JESSUP LLP

1   President/CEO, making him the highest- ranking officer of Northern Data's North
2   American operations.  Defendants subsequently filed multiple public documents
3   memorializing Plaintiff Porter's promotion and new title.

4       20.    After receiving the promotion, Plaintiff Porter for the first time began
5   getting a limited understanding of Northern Data's financials.  Plaintiff Porter was
6   shocked to learn that the company had a $30M German tax liability and additional
7   liabilities of almost $8M while simultaneously having only $17M cash on the
8   balance and a monthly burn rate of $3M-$4M.

9       21.    Shortly after becoming the President and CEO of Defendants, Plaintiff
10  Porter was asked to sign multiple legal documents including corporate restructuring
11  documents, asset sales and insurance contracts that required Plaintiff Porter to make
12  certain representations and warranties on Northern Data's behalf, including ones
13  relating to the company's financial strength and solvency.  Throughout February
14  2023, Plaintiff Porter had multiple conversations (via videoconference) with
15  Northern Data's Executive Leadership Team ("ELT"), including Thillainathan,
16  Yoshida, Black, and Kincaid-Smith (now COO) to express his concerns with the
17  company's financial state, cash position and solvency (or potential lack thereof).

18      22.    In early February 2023, Plaintiff Porter was also very troubled by
19  Northern Data AG's and Defendants' handling of their US tax treatment.  Following
20  Deloitte's refusal to provide an opinion letter supporting the companies' decision
21  not to pay the IRS any taxes for profits generated with cryptominers on US soil,
22  Plaintiff Porter assumed that the companies would change their operational structure
23  and/or tax treatment to not risk being in violation of US tax laws.  He also expected
24  that Defendants would take remedial measures to account for their rampant tax
25  evasion during previous years.  However, instead, Defendants took actions to
26  unlawfully avoid US taxes, or failing to report US taxable operations, at least for tax
27  year 2021.  Plaintiff Porter recognized that the US tax liability could easily be in the
28  tens of millions of dollars and given his existing concerns about the companies'

ERVIN COHEN & JESSUP LLP

1    solvency, it was clear that an IRS audit could potentially cause Northern Data to

2    become insolvent.

3        23.    On February 3, 2023, Plaintiff Porter informed Black



10        24.    Around this time, Thillainathan, Northern Data's CEO, stopped

11    returning Plaintiff Porter's communications, including his Microsoft Teams

12    messages, which was the primary method through which the two communicated.  In

13    February 2023, Plaintiff Porter began to understand that he was being iced out

14    because of his complaints and concerns regarding the companies' financial

15    misrepresentations and tax evasion.  Plaintiff Porter continued to communicate with

16    Yoshida, who privately stated he shared Plaintiff Porter's concerns.

17        25.    By early March 2023, Plaintiff Porter came to understand that the

18    decision to use the offshore entity and not recognize or pay any US taxes from the

19    US-based cryptomining operations came directly from Thillainathan, who, on

20    information and belief, was also its founder and largest employee shareholder (and

21    thus stood to gain the most if the company propped up its revenue by failing to pay

22    taxes).  On further information and belief, while Thillainathan had attempted to

23    couch this decision as purely a business-based risk, he in fact recognized that the

24    companies were very likely in fragrant violation of US tax laws and simply chose to

25    chart this course of action for the companies for his own personal financial self-

26    interest.

27        26.    In early March 2023, Plaintiff Porter had numerous conversations with

28    Yoshida about his concerns about the companies' finances and misrepresentations

ERVIN COHEN & JESSUP LLP

1  related thereto, including specifically the US tax evasion which was creating an 8

2  figure tax liability.  On multiple occasions, Porter told Yoshida that he was planning

3  on going above Thillainathan to report on Thillainathan's and Defendants' illegal

4  activity, including its tax evasion and fraud.  On information and belief, Yoshida

5  relayed Porter's concerns and Porter's stated intent to engage in whistleblowing

6  activity to the ELT.  On March 14, 2023, Plaintiff Porter was so concerned that

7  Thillainathan was not looking out for the best interests of the companies that he sent

8  a WhatsApp message to Yoshida stating: "I wonder if this is something we go

9  around [Thillainathan] and directly to the board/shareholders?"

10  27.  Three days later, on March 17, 2023, Plaintiff Porter, who had been

11  given a retention bonus just three months prior and promoted to President/CEO of

12  North America two months prior, received notice that Defendants were terminating

13  him.  Plaintiff Porter was specifically told that he was not being terminated for cause

14  but rather because Defendants were eliminating the position of North American

15  Chief Operating Officer.  However, at that point in time, Plaintiff Porter was no

16  longer the COO but had already been elevated to President and CEO of North

17  America, highlighting that Defendants' purported justification was a complete

18  fabrication.  In truth, Plaintiff Porter was terminated for his whistleblowing activity

19  regarding Defendants' tax evasion and misrepresentations regarding its solvency

20  and  to prevent him from executing his plan to go directly to Northern Data AG's

21  Board of Directors because the executive officers were not taking proper (or any)

22  steps to address or fix the problems Plaintiff Porter identified.

23  **Plaintiff Gulsen Kama**

24  28.  Plaintiff Kama is an experienced accounting and finance professional,

25  having worked in several large public and private companies.  She is an expert in

26  corporate accounting.

27  29.  She has an engineering degree from Bogazici University in Istanbul,

28  Turkey, and a Master of Business Administration degree from the Terry College of

ERVIN COHEN & JESSUP LLP

1    Business at the University of Georgia, in Athens, Georgia, in the United States.

2        30.    In the past, Plaintiff Kama worked for several companies in a corporate

3    finance and accounting executive capacity, including, but not limited to, United

4    Airlines, the Great Atlantic & Pacific Tea Company, AIG, Jackson Hewitt Tax

5    Services and Quest Diagnostics.

6        31.    On June 21, 2022, Plaintiff Kama was offered a position as NACFO at

7    Northern Data, reporting to Yoshida.  Her start date was July 20, 2022.

8        32.    Plaintiff Kama's primary duties included central financial activities for

9    the Americas.  It required travel outside of New Jersey and the United States.  Her

10   base compensation was $330,000 per year, but there were additional performance

11   bonuses awarded, bringing her Target Total Compensation to $924,000.  She

12   received a $100,000 signing bonus, subject to a 12-month claw-back.  The

13   Agreement also awarded her 5,000 options for Northern Data AG stock, the parent

14   company.

15       33.    Like Plaintiff Porter, Plaintiff Kama also was not laid off during the

16   round of layoffs in November 2022.  In fact, she was promoted from NACFO to

17   Group DCFO in September 2022 and from Group DCFO to Group CFO in

18   December 2022.  Her salary was bumped by $70,000 from $330,000 to $400,000

19   per year as Group CFO.  Further, she was awarded a $110,000 performance bonus

20   in April 2023.  Defendants subsequently filed multiple public documents and made

21   public announcements memorializing Plaintiff Kama's promotion and new title.

22       34.    KPMG was the auditor for Northern Data AG for the audit of its 2020

23   and 2021 financials. It was understood that KPMG would also be handling the audit

24   for the 2022 financials. As Group DCFO, and later Group CFO, Plaintiff Kama led

25   the interactions with KPMG. Those interactions started in November 2022, and

26   turned into monthly checkpoints.  During a February 15, 2023, meeting with the

27   supervisory board, KPMG raised concerns about the liquidity position of the

28   company being a going concern, conditions KPMG gave to sign its engagement

ERVIN COHEN & JESSUP LLP

letter as Northern Data's auditor.  KPMG required the requested documentation regarding the company's position to be provided by mid-March 2023 at the latest in order to support the targeted May 2023 completion date for the audit.

35.     In a February 22, 2023 email, Plaintiff Kama notified the ELT that the draft liquidity forecast was completed and ready to be shared with KPMG.  KPMG asked for "confirmed/signed" commitments to be included in the forecast, and because of the delay in the capital raise and GPU sales contract, Plaintiff Kama wanted to make sure she was setting the right expectation with the auditors.

36.     Plaintiff Kama then recommended in a series of emails to Kincaid-Smith, Tom Schorling, the Chair of the Supervisory Board, Thillainathan, Black, and the ELT, all dated March 2, 2023, ██████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████ .

37.     In February 2023, Plaintiff Kama began providing weekly updates regarding the liquidity and audit status to the CEO, COO, the ELT and the Supervisory Board.  After Plaintiff Kama provided an update on March 6, 2023, Thillainathan indicated that the capital raise should be completed in a week in order to avoid a liquidity crisis.

FIRST AMENDED COMPLAINT

38.    On March 6, 2023, Plaintiff Kama and Black ███████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████.

39.    Plaintiff Kama recognized that Defendants were not only being untruthful with their auditors, KPMG, but they were also misrepresenting their financial position (including possible insolvency) to their current and potential investors.  As soon as Plaintiff Kama raised this issue to members of the ELT, she was purposefully left out of critical communications and fund-raising activities.

40.    She attempted to mitigate the situation.  On April 3, 2023, Plaintiff Kama expressed concern to Kincaid-Smith regarding her exclusion from critical financial conversations, but her concerns were brushed off.

41.    Then, the ELT actively took numerous steps to hide material company financial and legal information from her.  For example, in April 2023, Thillainathan created a critical audit deficiency when he released information regarding the various executive bonuses without giving Plaintiff Kama a calculation or receiving her written approval for said bonuses beforehand.

42.    Further, Thillainathan and Kincaid-Smith were about to send out press releases with financial information without Plaintiff Kama's review or approval, falsifying Defendants' financial status.  ███████████████████████████

████████████████████████████████████████████████████████.

Again, this would be the same type of securities fraud or misleading the market, for which a criminal complaint was already previously filed by the German financial regulators BaFin against Northern Data executives in October 2021.

ERVIN COHEN & JESSUP LLP

43. ████████████████████████████████████████████

████████████████████████████ .

44.     In addition, Plaintiff Kama advised Thillainathan to get the Finance and Legal departments more involved in the business-impacting decisions early to avoid major risks to corporate governance and the audit, but her advice was again ignored.

45.     This was odd because Plaintiff Kama's work was roundly praised.  On April 24, 2023, before sending out the forecast submission to KPMG, Plaintiff Kama emailed Black, Kincaid-Smith and Thillainathan, ███████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████  Kincaid-Smith stated that the submission "looks fab."  As such, the business plan and liquidity forecast with a summary of the underlying assumptions were given to KPMG on April 25, 2023, and a detailed walk-through of the documents took place on May 3, 2023.

46.     In late April 2023, Plaintiff Kama spoke with Black ████████ ███████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████ ██ .

47.     As of May 3, 2023, the KPMG engagement still had not been signed. Thillainathan then demanded that Plaintiff Kama start looking into other auditors for the 2022 and 2023 audits.  While he said to look at the top 20-25 ranked auditors; he expressed that he did not care if they were ranked that high, because no one cares who the auditors are.  He claimed KPMG was being difficult and unreasonable, but the underlying command was that he wanted a company that would perform the audit with no questions asked.  Plaintiff Kama attempted to push back but Thillainathan ordered her to do as instructed and told her point blank that her head

ERVIN COHEN & JESSUP LLP

1  was on the chopping block.  So to be clear, Thillainathan and Kincaid-Smith were

2  purposefully committing accounting and securities fraud, hiding things from Kama,

3  refusing to give her information, and then overtly threatening her.

4      48.    Thillainathan told Plaintiff Kama that Legal and Finance should stay

5  out of his way; they were mere support functions whose purpose was only to

6  execute deals that were negotiated by the CEO and COO, no questions asked.  He

7  then stated that Legal and Finance are the "road blockers" and have stood in the way

8  of Northern Data's ability to take advantage of new opportunities.  He stated both

9  departments must follow the COO's direction. Kama took this to mean in no

10  uncertain terms that she was not to question Thillainathan's or Kincaid-Smith's

11  orders nor question their actions, even if they plainly ran afoul of accounting or

12  securities laws or otherwise amounted to fraud.

13      49.    Two days later, on May 5, 2023, in a meeting with Kincaid-Smith,

14  Plaintiff Kama was again told to just go along with what Thillainathan wanted, no

15  questions asked.  Plaintiff Kama stated that Finance and Legal were there to protect

16  the company, the Board and the CEO from undue risk, and that the departments had

17  to follow regulations and the law and, as such, if Thillainathan wanted to continue

18  with his actions, he at least had notice of the risk.  She would not take on personal

19  risk by not making the CEO aware of any and all risks.  She also indicated that she

20  may be asked to testify if there is a legal proceeding in the future.

21      50.    KPMG notified Plaintiff Kama during a May 9, 2023, Teams call, that

22  the first round of internal reviews was successful; no additional documents were

23  needed.  On May 12, 2023 Teams call, KPMG indicated its review was still in

24  progress and it was promising; so, the audit's time frame discussion could take place

25  the following week.

26      51.    In a June 2, 2023, email, Thillainathan requested that Plaintiff Kama

27  provide her with a weekly update on the audit, which she had already been doing for

28  months.  Thillainathan expressed his "deep concern regarding the level of

1   information shared" with him during the audit process even though Plaintiff Kama
2   had provided updates to him and the other executives on at least 24 separate
3   occasions since becoming CFO. Thillainathan asked for a report immediately
4   regarding the steps taken to ensure that KPMG sign the engagement letter.

5        52.    At that point, in an email dated June 4, 2023, Plaintiff Kama stated that
6   the audit process required significant executive attention and provided Thillainathan
7   with the information requested, noting that until the engagement letter was signed,
8   and KPMG allocated resources to the audit, the timeline could not be finalized. She
9   also reminded him that she had shared at least 24 email updates with him over the
10  last few months. She further stated that audit process would be difficult and time-
11  consuming, "as it will require a critical review and revamp of the company's
12  corporate governance practices and internal controls for financial and operational
13  management of the business." She was terminated four days later.

14       53.    On information and belief, Black himself grew frustrated and
15  concerned with having to participate, cover and/or prevent Northern Data's systemic
16  fraud and quit the ELT although Plaintiff Kama does not know the date.

17       54.    On June 7, 2023, Plaintiff Kama refuted claims within a June 6, 2023,
18  email from Kincaid-Smith. In the email, Kincaid-Smith alleged that Plaintiff Kama
19  had cancelled all one-on-one budget meetings over the last two months. This was
20  an outright lie and was Kincaid-Smith's attempt to create a false record. Plaintiff
21  Kama supplied records that demonstrated that all but one meeting was cancelled by
22  Kincaid-Smith, not Plaintiff Kama. Plaintiff Kama only cancelled the meeting
23  scheduled for June 6, 2023. In the June 7, 2023 email, Plaintiff Kama stated again
24  that she was being "threatened and retaliated against for her efforts to complete the
25  company's audit process, follow the laws and accounting rules, and impose audit
26  controls and governance procedures on management," and that Kincaid-Smith was
27  circumventing her authority and "violating critical corporate governance and
28  internal controls that are critical for an audit."

ERVIN COHEN & JESSUP LLP

55.     Then Plaintiff Kama, via a June 7, 2023, email to the Finance Leadership Team, issued a special "hold notice" to the Accounting and Finance Department in order to ensure proper corporate governance and internal controls required by the audit process.  She also issued a directive not to spoliate any accounting records.  The notice reads, in part, as follows:

"1. Effective 1PM EST Jun 6, 2023 there is a hold notice on all e-mails, instant messages, documents, files etc. Please DO NOT spoliate any historical records.

2. If anybody from the ELT (CEO - Aroosh Thillainathan, COO - Rosanne Kincaid Smith, GC - Jim Black), Managing Directors (Head of Mining - Niek Beudeker, Head of Cloud - Karl Havard, Head of DCI - Corey Needles), VP Corporate Strategy - Stephanie Ehrenberg, Head of Investor Relations - Jens-Philipp Briemle, Chief of Staff - Maximilian Martin, directly reach out to you requesting financial information, analysis, advice, reporting, etc. I need to be made aware of the request immediately.

3. If any ELT member is on an email where I am not included, it needs to be forwarded to me immediately.

4. Any meeting with any other ELT member(s) where I am not on the attendee list, I need to be made aware of ahead of the meeting taking place.

5. Any work product (reports, analysis, working files in Excel, Word, Power Point, etc.) produced by Finance needs to go through my explicit review and approval before it can be released outside of Finance.  Examples include but are not limited to, analysis, figures or statements to be used in press releases or any other communication with investors, vendors, partners, clients, advisors.

6. Access to live working files on restricted Finance group or individual Finance Team member folders should not be granted to people outside of Finance. I have shared instances with you where assumptions in critical analysis were manipulated and then shared with the CEO under the guise of Finance, i.e. the CFO approving the numbers. This is a critical gap in the controls and corporate governance process that needs to be remedied immediately.

7. No payments can be made on behalf of the company without my explicit review and approval of the payment."

56.     Following that, on June 8, 2023, after receiving a large bonus just two months prior, Plaintiff Kama was told she was terminated for cause from her position as CFO via an email from Linda Lee, Head of People Ops.  She was

ERVIN COHEN & JESSUP LLP

1    specifically told in the email that she was being terminated because other staff

2    members allegedly complained about how she allegedly treated them, although she

3    was never given any notice of said alleged complaints.  All of these alleged

4    complaints magically appeared after Plaintiff Kama  questioned and complained

5    about the accounting and securities fraud that the executive management, and in

6    particular, Thillainathan and Kincaid-Smith, wished to perpetuate on the investors

7    and KPMG by misleading them as to Defendant's financial status.  Defendants'

8    justification was a ruse, a complete fabrication.  During her tenure at Northern Data,

9    Plaintiff Kama received numerous messages, including lms and WhatsApp

10   messages, from the CEO, COO and GC singing her praises.  Further, she was

11   offered a severance package, which she would not have been offered had there been

12   any merit whatsoever to Defendants' claims.  In reality, Plaintiff Kama was

13   terminated for her repeated whistleblowing activities.  She was terminated because

14   she called out her superiors when they were going to perpetuate fraud upon the

15   shareholders and upon the auditor by misrepresenting the company financial

16   position.

17        57.    Plaintiff Kama's termination came just one business day before

18   Northern Data's extraordinary shareholders meeting on June 12, 2023, at which

19   resolutions about authorizing additional equity capital diluting the existing

20   shareholders were voted on by only 20% of shareholders who signed up to vote.

21   The shareholders did not hear any announcement about the issues the Plaintiff Kama

22   had raised or the fact that Plaintiff Kama had been terminated after she raised these

23   concerns.

24        58.    Northern Data has repeated this scheme numerous times since April 12,

25   2023, just raising capital through additional authorized shares (a move that was

26   approved by only few shareholders who personally benefitted from these

27   transactions), followed by issuing hyped-up press releases to drive up the stock

28   price.

ERVIN COHEN & JESSUP LLP

59.     Defendants further misled investors by publishing an investor presentation in April 2023 with financials with Plaintiff Kaman's name, title as CFO and picture.  They did not ask Plaintiff Kama to review the presentation.  She did not approve it, so Defendants misappropriated her image and showed it in a false light, invading her privacy.

## FIRST CAUSE OF ACTION

## (WRONGFUL TERMINATION IN VIOLATION OF PUBLIC POLICY AS TO PLAINTIFF JOSHUA PORTER)

60.     Plaintiff Porter incorporates paragraphs 1-59 as though set forth in their entirety herein.

61.     Defendants terminated Plaintiff Porter's employment in violation of various fundamental public policies underlying both state and federal law. Specifically, Plaintiff Porter's employment was terminated because of his whistleblowing complaints, and statements of intent to notify the Board of Directors and others, that Thillainathan and Northern Data had engaged in tax evasion by diverting the profits from the US-based mining operations offshore and not paying any US taxes thereon and his repeated concerns that Northern Data's frequent statements, representations and warranties about its financial condition and solvency were misleading and/or untrue given the German and US tax liabilities, limited cash on hand and monthly burn rate.

62.     As a proximate result of Defendants' wrongful termination of Plaintiff Porter's employment in violation of fundamental public policies, Plaintiff Porter has suffered and continues to suffer humiliation, emotional distress, and mental and physical pain and anguish, all to his damage in a sum according to proof.

63.     As a result of Defendants' wrongful termination of Plaintiff Porter's employment, he has suffered general and specific damages in sums according to proof.

/ / /

64.     Defendants' wrongful termination of Plaintiff Porter's employment was done intentionally, in a malicious, fraudulent and oppressive manner, entitling Plaintiff Porter to punitive damages.

65.     Plaintiff Porter has incurred and will continue to incur legal expenses and attorneys' fees.  Pursuant to CCP section 1021.5 and 1032, Plaintiff Porter is entitled to recover reasonably attorneys' fees and costs in an amount according to proof.

## SECOND CAUSE OF ACTION
### (VIOLATION OF LABOR CODE SECTION 1102.5
### AS TO PLAINTIFF JOSHUA PORTER)

66.     Plaintiff Porter incorporates paragraphs 1-66 as though set forth in their entirety herein.

67.     At all relevant times, Labor Code Section 1102.5 was in effect and was binding on Defendants.  This statute prohibits Defendants from retaliating against any employee, including Plaintiff Porter, for raising complaints of illegality.

68.     As set forth above, Plaintiff Porter complained to Northern Data's executive officers and stated his intent to inform the Board of Directors of the companies' illegal behavior including tax evasion and providing misleading and/or false statements, representations and warranties to investors, regulators and business partners about the companies' solvency and financial condition.  Accordingly, Porter put Northern Data on notice that he believed that Northern Data was engaging in underlying fraud as well as actions that would constitute violations of numerous federal laws including at minimum 18 U.S.C. Section 1341, 18 U.S.C. Section 1343, 18 U.S.C. Section 1348, Rev. & Tax Code Section 7152, 26 U.S.C. Section 7201; and 26 U.S.C. Section 7206.

69.     Plaintiff Porter's whistleblowing activity commenced in early February 2023, shortly after he was promoted, and Defendants took the most punitive adverse employment action possible, terminating him, only six weeks later.

ERVIN COHEN & JESSUP LLP

70.     As a proximate result of Defendants' willful, knowing and intentional violations of Labor Code Section 1102.5, Plaintiff Porter has suffered and continues to suffer humiliation, emotional distress, and mental and physical pain and anguish, all to his damage in a sum according to proof.

71.     As a result of Defendants' adverse employment actions against Plaintiff Porter, he has suffered general and specific damages in sums according to proof.

72.     Defendants' misconduct was done intentionally and in a malicious, fraudulent and oppressive manner, entitling Plaintiff Porter to punitive damages.

73.     Labor Code Section 1102.5(j) provides for the recovery of attorneys' fees and Plaintiff Porter is entitled to recover his reasonable attorneys' fees and costs in an amount according to proof.

## THIRD CAUSE OF ACTION

## (WRONGFUL TERMINATION IN VIOLATION OF PUBLIC POLICY AS TO PLAINTIFF GULSEN KAMA)

74.     Plaintiff Kama incorporates paragraphs 1-73 as though set forth in their entirety herein.

75.     Defendants terminated Plaintiff Kama's employment in violation of various fundamental public policies underlying both state and federal law. Specifically, Defendants  retaliated against Plaintiff Kama because of her whistleblowing complaints regarding the Defendants' intention to mislead their potential auditor and the potential and current investors regarding the Defendants' financial position, including with respect to the same liquidity and  tax evasion issues that Porter raised and was ultimately terminated for requesting be remedied. Accordingly, Kama complained of activities that constitute the same statutory violations identified by Porter in paragraph 68 above.

76.     Plaintiff Kama has suffered and continues to suffer humiliation, emotional distress, and mental and physical pain and anguish, and, as a result, she has been damaged in a sum according to proof, as a proximate result of Defendants'

ERVIN COHEN & JESSUP LLP

1   wrongful termination of Plaintiff Kama's employment in violation of fundamental

2   public policies.

3        77.    Defendants' wrongful termination has caused Plaintiff Kama to suffer

4   general and specific damages in sums according to proof.

5        78.    Plaintiff Kama is entitled to punitive damages as Defendants' wrongful

6   termination of her employment was done intentionally and in a malicious, fraudulent

7   and oppressive manner.

8                          **FOURTH CAUSE OF ACTION**

9       **(VIOLATION OF NEW JERSEY'S CONSCIENTIOUS EMPLOYEE**

10      **PROTECTION ACT  ("CEPA"), N.J.S.A. § 34:19-1, *ET SEQ.***

11               **AS TO PLAINTIFF GULSEN KAMA*)***

12       79.    Plaintiff Kama incorporates paragraphs 1-78 as though set forth in their

13  entirety herein.

14       80.    At all relevant times, CEPA was in effect and was binding on

15  Defendants.  Defendants are prohibited, pursuant to the statute, from retaliating

16  against any employee, including Plaintiff Kama, for raising complaints of illegality.

17       81.    As set forth above, Plaintiff Kama complained to Northern Data's

18  executive officers repeatedly in order to keep them from reporting inaccurate

19  financial information to their auditors and/or investors and to try to stop them from

20  providing misleading and/or false statements, representations and warranties to

21  investors, regulators and business partners about the companies' solvency and

22  financial condition.  Accordingly, Kama complained of activities that constitute the

23  same statutory violations identified by Porter in paragraph 68 above.

24       82.    Plaintiff Kama's whistleblowing activity commenced in or about late

25  March 2023 and progressively ramped up until she was terminated on June 8, 2023,

26  in retaliation for said whistleblowing activity.

27       83.    Defendants took the most punitive adverse employment action possible,

28  terminating her in retaliation for her whistleblowing activities.

ERVIN COHEN & JESSUP LLP

84.    Plaintiff Kama had a reasonable belief that the Defendants' conduct was violating either a law, rule, regulation, or public policy and as a result, she performed a "whistle blowing" activity.  There was an adverse employment action in that she was terminated.  The causal connection exists in that Plaintiff Kama had repeatedly warned the Defendants about its inappropriate and illegal conduct.

85.    As a proximate result of Defendants' willful, knowing and intentional violations of New Jersey's CEPA, N.J.S.A. § 34:19-1, *et seq.*  Plaintiff Kama has suffered and continues to suffer humiliation, emotional distress, and mental and physical pain and anguish, all to her damage in a sum according to proof.

86.    Plaintiff Kama has suffered general and specific damages in sums according to proof as a result of Defendants' adverse employment actions against her.

87.    Plaintiff Kama is entitled to punitive damages as Defendants' misconduct was done intentionally and in a malicious, fraudulent and oppressive manner.

88.    CEPA provides for the recovery of attorneys' fees and Plaintiff Kama is entitled to recover her reasonable attorneys' fees and costs in an amount according to proof.

## FIFTH CAUSE OF ACTION
### (MISAPPROPRIATION OF NAME AND LIKENESS AS TO PLAINTIFF GULSEN KAMA)

89.    Plaintiff Kama incorporates paragraphs 1-88 as though set forth in their entirety herein.

90.    California's and New Jersey's common-law rights of publicity protect people from the unauthorized appropriation of their identity by another for commercial gain.

91.    Defendants have used the Plaintiff Kama's identity by publishing her name, title and image in such a way that it looks like she authored and/or reviewed

ERVIN COHEN & JESSUP LLP

1  an authorized a presentation for investors or potential investor beginning in April

2  2023, when she never reviewed or approved the presentation, and which was placed

3  on Defendants' website.  On information and belief, Defendants have continued to

4  publish this presentation after Kama was terminated and became a California

5  resident and, on further information and belief, the investor presentation of  April

6  2023 is still available on Northern Data's website, accessible by anyone.

7       92.     At no time has Defendants sought consent from Plaintiff Kama prior to

8  publication, or even after publication of said presentation.

9       93.     Defendants' appropriation and use of Plaintiff Kama's name,

10  photograph and  likeness without her consent injured Plaintiff Kama by violating her

11  privacy.

12       94.     In particular, Defendants have prevented and continue to prevent

13  Plaintiff Kama from retaining control over the dissemination of her personal

14  information.

15       95.     Plaintiff Kama also suffered economic injury because she was not

16  compensated by Defendants for the use of the photo, name and likeness.  Further,

17  her name and likeness appear in a document with fraudulent financial information

18  that she did not review and approve beforehand; which could lead to the conclusion

19  that she approved the publication of the investor presentation with misleading or

20  false information.  Plaintiff Kama alleges that it is highly offensive that she would

21  be publicly associated with outward facing fraudulent statements, particularly given

22  her professional career as someone responsible for ensuring the accuracy of

23  company's financial information.

24       96.     Kama is entitled to compensatory damages in an amount to be proven

25  at trial.

26  / / /

27  / / /

28  / / /

ERVIN COHEN & JESSUP LLP

# SIXTH CAUSE OF ACTION

## (FALSE LIGHT INVASION OF PRIVACY
## AS TO PLAINTIFF GULSEN KAMA)

97.    Plaintiff Kama incorporates paragraphs 1-96 as though set forth in their entirety herein.

98.    Plaintiff Kama has a prima facie case for invasion of privacy by appropriation of name or likeness requires as Defendants appropriated Plaintiff Kama's name or likeness and are still appropriating Plaintiff Kama's name and likeness.

99.    Defendants never obtained Plaintiff Kama's consent at all, ever, for their use of her name and likeness as part of a financial document that she had never reviewed or approved and that likely contained misleading or false information.

100.   As her name and likeness was on a document, an investor presentation, that obviously would be sent to investors and potential investors, as well as others, and was easily accessible from Defendants' website, the name and likeness was used for the Defendants' use or benefits.  It also presented Plaintiff Kama in a false light because it portrayed her as approving of the publication of the investor presentation with misleading or false information.  As a highly trained professional whose entire career is focused on ensuring accurate financial reporting and truthful financial disclosures to auditors and investors, Plaintiff Kama was uniquely harmed by Defendants' creating the inference, via the false investor report, that Plaintiff Kama supported, encouraged and/or authorized the publication of false financial information.

101.   The report contained false information, which makes Plaintiff Kama unintentionally complicit in Defendants' fraud upon its auditors and current or potential investors.  This is particularly problematic for Kama whose chosen profession involves vetting the accuracy of company's disseminated financial information.

102.   In addition, she was shown in a false light to be employed Defendants when the document still remained on the website after she was terminated.

103.   Plaintiff Kama was damaged by Defendants' unauthorized and purposeful use of her name and likeness.  She suffered harm to her reputation and damage to her occupation in an amount to be proven at trial.

## **DEMAND FOR JURY TRIAL**

Plaintiffs demand trial of this matter by jury.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for judgment against Defendants as follows:

1.     For general, compensatory and special damages according to proof;

2.     For exemplary damages according to proof;

3.     For pre-judgment and post-judgment interest on all damages awarded;

4.     For costs of suit, including attorneys' fees to the extent allowed by law; and

5.     For such other and further relief as the Court deems just and proper.

DATED: June 14, 2024                    ERVIN COHEN & JESSUP LLP

By: _____
                                         Russell M. Selmont
                                         Attorneys for Plaintiffs, Joshua Porter
                                         And Gulsen Kama

ERVIN COHEN & JESSUP LLP

18254.1:11261766.1

26